DON SAVERY, County Attorney (now JOHN E. BUDD, County Attorney), appellee, v. HELEN EDDY et al., minors, by their next friends (parents), appellants.

No. 47811.

(Reported in 45 N.W.2d 872, 47 N.W.2d 230, 48 N.W.2d 230)

FEBRUARY 6, 1951.

APRIL 6, 1951 (GRANTING REARGUMENT IN PART).

SUPPLEMENTAL OPINION JUNE 5, 1951 (CHANGING RULING TO: AFFIRMED IN PART AND REVERSED IN PART).

Rudolph & Rudolph and Dalton & Dalton, all of Atlantic, for appellants.

Don Savery, County Attorney, now John E. Budd, County Attorney, pro se.

Gilmore & Dull, of Ottumwa, for American Home Finding Association appearing specially.

Miller, Huebner & Miller, of Des Moines, for Lutheran Welfare Society of Iowa appearing specially.

Herbert H. Hauge, of Des Moines, amicus curiae.

MULRONEY, J.—Donald and Bernice Eddy, formerly of Atlantic, Iowa, are the parents of thirteen children. On January 24, 1946, the county attorney of Cass County filed a complaint under chapter 232, Code, 1950, wherein he alleged that Helen, Phyllis, Gerald, Sharon, Marilyn, Robert, Gloria, Beverly, Esther, and Charles Eddy were, to his best information and belief, "minors under the age of eighteen years; that the defendants are neglected." The prayer asked "that the necessary steps be taken to investigate the charge herein preferred, as provided by law, to the end that such orders may be made as the court may deem advisable in the premises."

The next entry in the record before us is an order of the trial court dated January 30, 1946, reciting that a hearing had been held that day in court with the parents of the minor children present. In the order the court found the ten minor children "are dependent and neglected children and that they should be placed under the jurisdiction of this court." The order went on to direct that Gerald, Marilyn, Robert, Beverly, Esther, and Charles be placed in the care and custody of the American Home Finding Association of Ottumwa, Iowa, and that Helen, Phyllis, Sharon, and Gloria, be placed in the care of the Lutheran Welfare Society of Iowa. This order also ordered the father to pay $115 to the clerk for the support of these minors. If there was evidence introduced at the "hearing" referred to in the foregoing order it was not reported. But it is perfectly clear, as will appear later, that this order was temporary and the custody award therein made was not intended to be final.

The next that appears in the filed record is an application for citation for contempt filed by the plaintiff on March 30, 1946, against Donald for his failure to make the payments he was ordered to make in the order of January 30, 1946. This is followed by an abstract of the testimony introduced on the contempt hearing and the court order dated April 15, 1946, finding Donald guilty of contempt and sentencing him to sixty days in jail but ordering the mittimus on the commitment to jail withheld "so long as the defendant Donald Eddy shall pay" $30 a week.

On June 14, 1946, the court entered an order in the case

transferring Helen to the Iowa Juvenile home at Toledo, Iowa, "as a neglected minor."

Subsequent orders appear in the record to the effect that on June 1, 1946, Donald, being unable to work because of a broken arm, was excused from payments under the contempt order during June and until July 27, 1946. On July 18, 1947, the court made an order that Ramona Murray, Cass County's welfare director, investigate the parents' home, then in Omaha, Nebraska, "and make a report to the court upon the advisability of returning the children or some of them to their home."

In September of 1948, a hearing was held and before the hearing commenced the court made a statement "to preface the record in this case." The court stated that on January 30, 1946, he had entered an order "whereby the custody of the children was removed from the parents and the children placed with the Lutheran Welfare Society and American Home Finding Association of Ottumwa on the ground of giving you people [the parents] an opportunity to rehabilitate yourselves and have an opportunity to have the children back with you, and two years and nine months have expired, and I feel that in fairness to the children, some definite determination should be made at this time as to whether or not you are in position to assume the responsibility of the children." The evidence on this hearing was reported (at the parents' expense) and an abstract of the testimony is in the filed record. At this hearing the plaintiff offered no testimony, but rested immediately after the parents closed their case. On January 15, 1948, the court entered the "final order" wherein it is recited that the order of January 30, 1946 was not final and that the parents were at that time informed "that if, within a reasonable time they would offer proof to this court that they had rehabilitated themselves and were in position to give said children care, custody and control, that the court would return said children to the parents." In the order the court "now finds that on the 30th day of January, 1946, the court found that [the children] were neglected and dependent children * * *." The order goes on to find that the parents had failed to show they could care for the children and the order provided that the custody of the children was "permanently taken from the parents" and the custody of the children was "perma-

nently" placed in the institutions where they were originally sent. On October 14, 1948, the defendants filed a notice of appeal from the above order in the clerk's office.

Since the trial court's order leaves the institutions free to give these eleven children away in adoption (section 232.22, Code, 1950) so the parents will be deprived of all rights to visit them, we can see the question here is of tremendous importance. The power of courts to undo the custodial relationship of parents and their children should only be exercised upon convincing testimony that by so doing the best interests and welfare of the children are served. Because of the importance of the case we feel the evidence must be set forth in considerable detail. At the outset we will make a few general observations and, by way of background, some preliminary statements concerning the Eddy family. Much of the cross-examining of witnesses at the September 1948 hearing was by the court, and the record fairly shows the court was only anxious to find out if it would be for the best interest of the children to return them to their parents. Throughout he exhibited the utmost patience and concern in this most difficult case and we can well believe his decision was not easily arrived at. No objections were offered to any testimony and we cannot help but feel the plaintiff at the September 1948 hearing was making little more than perfunctory resistance to an order returning the children to their parents. As stated, the plaintiff offered no testimony at that hearing and plaintiff's brief in this court contains less than three pages of brief and argument with no analysis of the testimony. One puzzling thing in the record is that we are told throughout that the action involved eleven of the Eddys' thirteen children. Deloris, the oldest girl, is not named in the original complaint or in any order. And yet the father testified she was taken away by the original order, and the parents seek her return. The two oldest children, admittedly not here involved, were Arnold (who seems to be called Harold) and John. These are the ages of all of the children in September of 1948: Harold 20, John about 18, Deloris 16, Helen 14, Phyllis 12, Gerald 11, Gloria 10, Sharon 9, Marilyn 7, Robert 6, Beverly Ann 5, Esther 4, and Charles 3.

Donald Eddy was forty-one years old in September of 1948. The family lived in Lewis (Cass County) Iowa prior to 1940 and

from 1940 until the original hearing in 1946 they lived in Atlantic, Iowa. Donald was a truck driver, driving trucks for a transfer line out of Omaha on long runs and was seldom home oftener than one night a week. After the order of January 1946, Donald Eddy continued trucking for a time and then moved to a farm near Auburn, Nebraska, during a part of the crop year 1947 and 1948. Evidently Donald Eddy was a laborer on this farm earning $100 a month, with a large house to live in, and while on the farm the court excused him from the payments provided in the contempt order. He lost this job and moved to Omaha in May of 1948, where they were living at the time of the September 1948 hearing. Donald Eddy's work in Omaha was that of a taxicab driver.

We do not have too clear a picture of the situation in January of 1946. Perhaps this is not important, for the order at that time was admittedly a temporary order, but there is no question at all but that at that time Mrs. Eddy was sick and in need of hospital care. Ramona Murray, the welfare director, testified at the contempt hearing in March of 1946 that she had done "servicing concerning the Eddy children since the summer of 1944, and that it had been continuous since then, although not as steady until the past 6 months." The record shows Mrs. Eddy had been in the hospital shortly before the January 1946 hearing. The first payment the county made for the Eddy family was a $25 grocery order two days before the original petition was filed. Apparently the Eddys were about six or seven hundred dollars in debt in January of 1946.

The first witness at the September 1948 hearing was Donald Eddy. He testified he was a regular employee of a cab company earning $45 a week. He and his wife lived in Omaha in a modern house with three rooms and a kitchenette which they rented for $23 a month. The two oldest boys were in the Army. Harold had secured a dependency allowance and they received $37 a month from this allowance and there was a chance this would be raised to $50. John, the second son, who was in the Army in Germany, occasionally sent home $70 and sometimes as much as $100. Until three weeks before the hearing Mrs. Eddy had worked and earned $25 a week.

Mr. Eddy said he thought their house was too small for all of the family but he described the difficulty of renting a house in Omaha and his efforts to secure a larger place before this hearing. He had secured some promises of help from some Omaha concerns. He ran ads in the Omaha paper and answered many other ads in his efforts to secure a larger home or an acreage in a suburb. He said there was a built-on garage on their house and for the present this could be fixed up for two bedrooms. He had bought a secondhand car since they had lived in Omaha so he and his wife could drive to the institutions to see the children, and though he owed a small balance on this they were not otherwise in debt and he would sell the car if he could get the children back.

He said: "I want to keep the children together, because one loves one as much as the other. * * * I love the children more than anything else in the world. If I got them back I would try to guide and direct them like they should be. They were above average students when in school in Atlantic. Never had any trouble with them and they never been in trouble."

Mrs. Eddy testified on direct examination: "I have worked most of the time while in Omaha except last winter and have contributed to the family budget. The children have not been living with us in Omaha. We have an available location that we can get along with if the children are returned to us and I feel positive that we will get something better, and I feel that the house we have, just a small one, can be made to meet the occasion, if we do get the children back. The house is modern. Since we came back from the farm I have been earning $25 a week and Don $45. We receive the dependency benefit from Harold, it comes in my name. We are getting this to try to get the family together again. They knew there we didn't have the children when they filed or sent in the allowance, because it was all explained to them just what the deal was. We receive $37 monthly. I do not know what the possibility is of receiving something from John who is in Germany, as that was tried and refused, and he is trying again so I am not definite one way or the other. John sends money home but no definite amounts. He sends it quite often and he would send more often if the children were home. There is a possibility that the allowance from Harold will be in-

creased as it was his understanding it would be $50 a month. He has sent letters to that effect, and said he would do everything he could to help and he always did. I believe with the income we have and the assistance we get from Harold that we can properly take care of the children. I have canned about 500 quarts of food, which we still have. I did this with the expectation of having the children returned home and this was done while we were on the farm and it has been our hope to get the family back together. I love the children and will do my level best to take care of them if I get them back. I think I would be able to direct and guide them in Omaha as well as in Atlantic. When I was in Atlantic my health was not extra good but I kept going and since that time my health has improved and I am in good health now and am physically able to look after these 13 children, or 11 children that are involved herein. I think that Don's income, plus the dependency payments would be adequate to take care of the family. We can give them substantial food and clothing. The children are somewhat older now than when we lived in Atlantic and that would make it easier for us. Little babies are harder to care for and much more care is required than for older ones and I am sure it would be much easier now to care for them and I am willing to give it a thorough trial if I can get the opportunity. When we lived in Atlantic I had a hard time keeping them up with my health not so good. The picture has changed so that I will be able to go ahead and care for them now. As far as material care is concerned probably others could do as much as I could, but in love and talking to parents I think they would be better off in their own home. They wouldn't receive the care and affection in outside homes as they would in their own and if they are returned to us we will give them that parental care and affection that children need. The last time I saw the children they seemed to be in good health except the little boy seems to have a deficiency in his shoulder or chest. I know of no physical disability or other condition which might make it hard for us to look after the children. They are all normal children. They are all normal children, at least they are about the average and their schoolwork has been average. They have been able to keep up their grades and we have had no trouble whatever in that respect. The children have not been in

any difficulty or any other matter which the law would take an interest in, and if we get them back we expect to keep them that way. We have thirteen children, but only eleven are involved herein. * * * I will join with Don in keeping up the family and really working out a satisfactory manner in care of the children."

On cross-examination and redirect Mrs. Eddy testified: "There is always a way of making the ends meet if you make up your mind you are going to. I realize what it costs to feed a grown child and I recognize the responsibilities are greater as they grow older as they need some guidance and more work in that than they did before. I don't think it would affect my health at all because I am perfectly all right now. At present we don't have a home adequate to take care of the children as we would like, but I think it can be handled so we can get along. * * * I feel that under the conditions and circumstances, taking into consideration the cost of living, we can care for the children satisfactorily in Omaha. These are our children and I feel that we can overcome any difficulties and take care of the children properly. We have no personal debts so we can start anew and we can give the children a break, feed, clothe and educate them. Where there is a will there is a way. The children were in perfect health when they lived at home and if they had been starved and so on they couldn't have been in good health at that time. We had gotten only one relief order from the county, which is before the children were taken away from us. I don't know what more I would be able to say."

For the balance of the testimony we will resort to the digest of the witness' testimony appearing in the appellants' brief as follows: "Mrs. Sayles testified that she lived in Norfolk, Nebraska, and she was acquainted with the Eddy family. That Mrs. Eddy's mother was her sister, and that she visited in the Eddy home on numerous occasions over a period of years and has seen the children on numerous occasions. That she made observation as to the general care and attention the children received. The children always had plenty to eat and wear. Their mother was sick part of the time but that didn't have much to do with the children as she cared for them whether they were sick or not. She was doing her best to look after them. She

testified the parents should have the children. The parents properly looked after the children and had sufficient food. The children are getting to the place where they can help. It would be best for the children to remain with the parents. She said she did not like to see children adopted out and put in other homes. A broken home is no good. She further testified that the Eddys took good care of their children as parents could under the circumstances. Children don't have to have everything in the world. They did their best and love their children. Don doesn't drink and he and his wife have good characters.

"Mrs. Daniel Bower testified she knew Eddy and wife since their marriage. That she has known Don since he was four or five years old. Don Eddy and family have visited at her place. I am acquainted with some of the Eddy children, not with the younger ones, have not seen them in the past two years. They always looked good when I saw them. They had quite a group to manage and it would take good management to care for them. It would not take an expert to look after them. She says she knows the Eddys can take care of the children.

"Mark Eddy testified he is the father of Don Eddy and all the children have been to my place on many occasions; that he visited in their home for many years. Eddys have a lot of children and it has been quite a burden to take care of them. They have worked together for the children. The children were adequately cared for. They were fed and clothed, reasonably well. The children were not allowed to run around the streets and carry on in violation of the law. I ate in their home on different occasions and they had good food in adequate amount. The children were well nourished. Don works in Omaha and gets $45 per week and his wife works too. They get an allotment from the boy in the Army. They can support the family and they both love their children. If the children were given back to the parents I will co-operate and help. I have an income of my own.

"Mrs. Mark Eddy testified that she visited the Eddy home frequently and observed the children and they always had plenty to eat and milk to drink. The children would visit in the home of their grandmother in the summer and I made things for them. The Eddys can take care of the children. The older ones are big

enough to help. I have always done a lot of sewing for them and will continue to do so as long as they are at home. The children always minded well, and they are a fine bunch of children. They are good students.

"The witness William Lamberty testified that he was acquainted with Don Eddy and wife and had known them for ten or twelve years. The Eddy children never bothered anybody and they were well-behaved. They were not clothed up to the average as you know it would be with a gang of kids; they were not too well fed, they were trying to get along. They were fed but I don't think they had too much. The parents were good to the children and I never saw them mistreat the children, they were treated all right. They tried to take care of the children. The missus tried to do what was right; he was not there half of the time, he was in Alaska and I suppose she did a good job.

"Mrs. William Lamberty testified that she observed the Eddy children and that she lived about three houses from theirs, in the same block. Mr. Eddy was working in Alaska part of the time, and when home trucked out of some town away from here. I saw the children frequently. The mother kept the children at home. I have been in their home. Met all the children and I think Mrs. Eddy did the best she could for the children and it was quite a job. She raised a garden and tried. The children were average, well-fed, well-clothed. I never saw her beat or abuse the children. I never saw any wild parties or drunkenness around their place, they seemed to live pretty conservatively.

"Mrs. Chris Peterson testified she had known the Eddy family for about ten years and had been in their home and would see the children on the streets. I worked in their home a number of years ago. They didn't have silk and satins or rugs or curtains, maybe they didn't have fancy bedding but the house was clean. They seemed to take good care of the children, there was no confusion; they were shown a lot of love. I visited in their home while they lived on Sixth street in Atlantic. They kept the place clean. They didn't have the swellest material but as far as their stuff was concerned they had as much as normal Atlantic people who labor. The children were well-fed and healthy looking. The mother stayed home with the children and there was no beer drinking in their family.

"Mrs. Anton Peterson testified she was acquainted with the Eddys and visited in their home on numerous occasions. The children looked like they had plenty to eat. They had average clothing. They all get dirty. They were very good children. The children worked. While they lived in my neighborhood I never saw any drinking. She stayed at home and was pretty conservative. The children were good average children. In conduct I would say better than a lot of them. I never saw the father or mother abuse them. I know they loved their children.

"Bessie Smalley testified she lives in Omaha and I have known the Eddy family for about three years, and live in the same block. I run into their place every now and then. They have an old house, around four rooms. They keep it in nice shape, keep it nice and clean. They don't have what rich people have as they are working people. They have it nice, comfortable and clean. It is well-kept. I noticed they had canned food. They have a pile of it. I do not know how many jars. I know she canned about 600 quarts last year and she has still got a lot. I live close enough to Don Eddy and wife to make observations as to their habits and mode of living and as far as living habits are concerned they are average. They don't have parties, they don't drink, people don't come in there drinking, they don't have it around their house, never heard of them having any wild parties. They are home all the time when they are not working. Don drives a cab in Omaha, they are awfully good neighbors. I have heard no complaint against them. They are not extravagant or wasteful. Mrs. Eddy works practically all the time. Don's work is steady every day. I never did see him come home drunk. I think they love their children. I know she has worked a lot, wished she could have them home. She has lost a lot of weight worrying over them. If the court should give back their children I suppose they could keep them in that house and care for them. There are lots of people in worse living quarters. One family lives in a barn with seven children. That is a whole lot worse than their house. I know if they get the children back they can take care of them, they are making pretty good wages.

"Orville Mauk testified he was acquainted with the Eddy family and had known them for twelve years. I know the children when I see them. The children looked like they had enough to

eat. They had clothes to wear. They wasn't probably as up to date as some, but they were clean and the kids generally clean. I would say the reputation of the Eddys is good. Since they moved to Atlantic I would see Don once a week, maybe two or three times and I would see his wife occasionally and would see some of the children. Their clothes was clean as anybody's could be and they seemed to be sufficiently fed. I saw no condition which would indicate they lacked food. They looked to me like they were eating and were as good as anybody's children.

"Ronald Mauk testified that he knew the Eddys all his life; he went to school with some of the children. Never knew of them getting into any difficulty. They attended to their business; they were average students; their dress and apparent physical condition was good. They did not have fancy but good clean clothes like any kid of that age. I never heard of any wild or drinking parties at the Eddys. The children were well looked after and reared. Their parents really tried to look after and care for them. I drove a taxi in Atlantic and was in the trucking business with my uncle and Don worked for him and we were in pretty close contact. He was up town Saturday nights buying a sack of groceries to take home. He stayed home most of the time. Saw the boys working at the Spot. General physical condition and manner of dress of the boys seemed to be better after they moved to Atlantic. When Don worked with me on the truck line he was a good worker and dependable. I have not known of the children getting into trouble. I know of no drinking on the part of Don Eddy and have heard of none.

"Mrs. Jennie Peterson testified she was well-acquainted with Don Eddy and his wife. There was only one house between where I lived and where they lived. I went over and visited with them and she would come over to my place and the children almost every night. All the kids in the neighborhood did that. I got to know the children pretty well and also Mrs. Eddy. Don was gone most of the time working for Watsons. Their headquarters were in Omaha. I was in their house and noticed the children. They were clothed pretty well and they appeared to be well-nourished. They were good children and didn't get into any kind of trouble and they were well-disciplined. Their house had five or six rooms. There was no drinking in or around the

Eddy home. Mrs. Eddy stayed home with the children. She went to the show only twice in two years. The children were not left by themselves. The children got along well in school. Their household furnishings were about average for their station in life. Mr. and Mrs. Eddy were affectionate and kind towards the children. When the children were down at my place and they would see their dad's truck they would go running home. Don and his wife loved the children. As far as I could observe during this time I watched them over there, there was considerable affection between the parents and the children. The income of the Eddys would be sufficient to support the family. The Eddys is a type of family where the children would want to cling together. They were very thoughtful of each other. I never saw children so thoughtful of one another. I feel if they are separated it would be a real hardship. They were very close children. I never saw children as close as they were.

"Arnold Bruce Eddy testified: I am a member of the U. S. Air Force and rate as a sergeant. Have been there two years. I am the oldest boy of the Eddy family. Spent twenty-two months in Germany. My brother John is still over there. My allotment has been $37 a month to my parents, but I have word from the commanding officer that it is to be raised to $50 a month. I will have a promotion in the near future. My promotion would add additional amount to the allotment. I feel the children should be together with their mother and father."

The only place we learn anything about the wishes of the children is in the testimony of Arnold (Harold) who said he had visited all of the children since he had come home from Germany and they all wanted to come home. He also testified he had talked to John when he was in Germany and John was trying to get an allotment home and that he thought it would go through and John wanted the children all back home.

This is the entire record of testimony and on this record the court found "that during the two years and seven months that the children have been out of the custody of said parents that no preparation for their return has been made, and that said parents have failed to show any feasible plan under which they could undertake the care, custody, and control of said minors, and that no substantial financial improvement has been

shown, even though no payments have been made towards the care of said children by said parents since April 7, 1947." As previously pointed out the finding in this order that the children were dependent and neglected was merely that the court had previously, on January 24, 1946, so found.

I. We go back now to the procedural record in the case and the statutes involved. Section 232.5, Code, 1950, provides for the filing of a petition by any reputable citizen setting forth facts which render a child "dependent, neglected, or delinquent." The petition in this case filed by the county attorney set forth no facts and it did not allege the children were "dependent" or "delinquent." It alleged the children were "neglected." Section 232.2, Code, 1950, lists seven definitions of the terms "dependent" or "neglected" child. Those which might possibly be applicable here are that the child is "destitute, or homeless, or abandoned * * * dependent upon the public for support * * * without proper parental care * * * living in a home which is unfit."

Section 232.13, Code, 1950, provides the court shall "try the cause in equity unless a continuance appears advisable in the interest of justice." The next Code section (232.14) provides: "When, in the opinion of the court, an emergency exists, temporary provision may be made for the custody of the child, pending further hearing." As we examine the proceedings of January 1946 we feel certain the court was proceeding under the last above section in its order of January 30, 1946. The court could well find an emergency existed for the record shows the mother was sick and the father away from home most all of the time. We might add we feel he was proceeding correctly, except that it would have been better if the said order showed on its face that it was an order of temporary custody. But all parties agree it was temporary, and the court before the September 1948 hearing announced that his prior order was temporary. We think section 232.14, Code, 1950 would authorize a temporary order of custody without a record of the investigation that prompted the court to make it—though we feel that whenever a court is disturbing custodial relations of parents and their children it would be well to have some record of the evidence on which it is based. No reason at all exists for the court's refusal to grant the request of defendants' counsel to have the September 1948

hearing officially reported. This was the trial in equity which was to result in a decree dismissing the plaintiff's petition for permanent custody orders. Fortunately the defendants did, at their own expense, have the September 1948 proceedings reported, so the case is here de novo upon the record of pleadings and orders and evidence adduced at the trial.

II. We can quickly dispose of plaintiff's first contention that the case is not appealable. The statutes are plain. The appeal is from a final order in an equity action. See State ex rel. McPherson v. Rakey, 236 Iowa 876, 20 N.W.2d 43.

III. One other observation should be made concerning the plaintiff. The named plaintiff in the petition was Don Savery, the county attorney. The parties seem to assume that he brought the action in his official capacity as county attorney for Cass County. The statutes provide the petition is to be filed by any "reputable resident" and do not specifically provide for such an action by a county attorney in his official capacity. The case was tried below by Mr. Savery's successor, Mr. Budd, who orally argued here. No order for substitution of a successor public official under rule 20, R. C. P. was ever made. The point is not raised or argued but nothing herein is to be construed as a holding that the statutes authorize such action by a county attorney on behalf of the county.

The issue at the time of the September 1948 hearing was whether these children were "neglected" children as that term is defined in the statute. The court treated the issue as whether the then status of the parents was such that the children would not be neglected if custody was returned to them. This was the correct issue after his earlier order of temporary custody outside the parents' home. The issue then was whether the children would be "neglected" as that term is defined in the statute if they were returned to their parents.

Our inquiry is: Whether these children if returned to their parents would be "destitute, or homeless, or abandoned"— whether they would be "dependent upon the public for support" —whether they would be "without proper parental care"— whether they would be "living in a home which is unfit."

There is no evidence in this record to lead us to believe such dire consequences would follow if custody of these eleven

children were returned to their parents. We do not feel that under this record the children, who the parents are striving so hard to get back, will be left "destitute" in the sense that they will not be provided with the necessaries of life. They will not be "homeless" for the parents have a home for them. There is no indication that they will be "abandoned" or deserted by these parents.

In any custody order the determination is necessarily based on what is likely to occur in the future because of present conditions and because of what has occurred in the past. It cannot be said under this record that it is likely the children will be "dependent upon the public for support" if returned to their parents. The only support Cass County paid for this large family was one $25 grocery order before the children were taken away. The parents' financial position is better. The allotments of the soldier sons and the earnings of the older children will help in the days to come. The parents are without debt. We are convinced from the record of past "parental care" that these children will receive proper parental care if custody is returned to the parents. The father said he did not think he had been too good about caring for the children in the past but he was away from home so much in his trucking job and now he will be home everyday. It is perfectly clear that Mrs. Eddy possesses that self-forgetful devotion of a mother for the children she loves. The children were never abused. The parents do not drink. The record is that the children under past parental care were average well-behaved children.

IV. There is left then the question of the *fitness* of the home. This is the ground which the trial court seemed (at least by his questioning) to consider largely controlling. It fairly appears from the record that the trial court felt the parents should have provided a larger house before he could or should order custody of these eleven children returned to the parents. It could hardly be argued this would be a reason for depriving the parents of the custody of *all* of their children. We think it an insufficient ground upon which to rest an order depriving them of custody of any of their children. Of course the house is small. Any average house would be small for this large family. It has one or two fewer rooms than their Atlantic home but there

are also two less children in the family group with the oldest sons in the Army. All we learn of the home is that it is a modern house with three rooms and a kitchenette. If the welfare director ever made an investigation of the Omaha home, as she was ordered by the court to do, the plaintiff did not choose to introduce it in evidence. The parents show a record of trying to get a larger home. In these days of a difficult housing situation, they cannot be penalized because they have not as yet succeeded. That this home will present a housing problem to the parents of this large family we have not a doubt, but we cannot say it is an "unfit" home merely because it will be crowded. They may succeed soon in getting a larger home. The oldest son testified as to plans to buy a house by using his G. I. loan rights.

V. One other thing that seemed to prompt the trial court's finding was the poor record of support payments during the period the parents were deprived of custody and their earning or savings record during this period. The record shows the father paid the Cass County clerk $1020 for the support of the children during this period, paid off $650 in debts, bought a secondhand car, and supported the balance of his family—with his wife working part of the time. But it appears he was out of work part of the time due to injuries while a trucker and while a taxi driver and he was absolved from payments for the children's support during these periods and also while on the farm. The record shows the parents visited the children often and they brought them presents. Even if they did not accumulate much during this period as preparation for the children's homecoming, we do not feel their record in this respect warrants a finding that the children will now be neglected if returned to their parents.

We are convinced that the only order this record would support would be an order returning all of the children to the custody of their parents. The order appealed from is reversed and the case remanded for an order returning the children to the custody of their parents.—Reversed and remanded.

All JUSTICES concur except MANTZ, J., not sitting.

## ON REARGUMENT

WENNERSTRUM, C. J.—The petition for rehearing in this cause has been duly submitted and fully considered. The ruling thereon is as follows:

A rehearing is denied as to all children-appellants who have not been adopted by other parties, and the parents, Donald and Bernice Eddy, are entitled forthwith to the custody of said children.

As to the children-appellants who have been adopted by other parties a rehearing is granted and so much of the cause as involves the custody of the last mentioned children is to be resubmitted at the May 1951 period of the May 1951 term. Counsel for appellee or for the adoptive parents and counsel for appellants shall be entitled to oral argument on the resubmission upon the following points:

1. What effect should the court give to the adoption of the last mentioned children or to other happenings or circumstances subsequent to the order and judgment dated September 15, 1948, of the trial court herein.

2. What effect upon said adoption should be given to the failure of appellants to ask for or procure an order staying the order and judgment of September 15, 1948, pending the appeal herein.

Counsel for appellee or for the adoptive parents may, on or before April 27, 1951, file with the clerk of this court, and furnish copy to counsel for appellants, at least four copies of typewritten brief and argument upon the foregoing points. Counsel for appellants may, on or before May 4, 1951, file, and furnish copy to counsel for appellee or for the adoptive parents, four copies of typewritten brief and argument upon such points.

Counsel for appellee or for the adoptive parents may and should file with the Chief Justice of this court, and furnish a copy to counsel for appellants, on or before April 27, 1951, one or more affidavits (original and three copies thereof) by a party or parties with knowledge of the facts, stating the facts as to which defendants-appellants have been adopted and other facts deemed material that pertain to said adoptions, except that the names or residences of the adoptive parents need not, for reasons deemed sufficient by the court, be revealed.

Counsel for appellants may file with the Chief Justice on or before May 4, 1951, and furnish copy to counsel for appellee or the adoptive parents, one or more affidavits (original and three copies thereof) pertaining to said adoption matters.

## SUPPLEMENTAL OPINION

Supplemental opinion after partial rehearing in this case changing the ruling to: Affirmed in part and reversed in part.

MULRONEY, J.—Our original opinion in this case (page 822 of this volume), 45 N.W.2d 872, ordered all of the Eddy children returned to their parents. We granted rehearing as to those children who had been adopted by other parties pending the appeal in the original case. See order (page 840), 47 N.W.2d 230. Pursuant to that order, affidavit proof has been filed which establishes that Beverly, Charles, Marilyn, Robert, and Esther were all adopted after the order of September 15, 1948, which placed the "permanent" custody of the children in the American Home Finding Association. The proof shows that a certified copy of said order of September 15, 1948 was sent to the American Home Finding Association on September 16, 1948, and said association received no notice or knowledge of an appeal from said order.

All of said children were placed in homes of persons who had previously applied to the association as prospective adoptive parents shortly after the order of September 15, 1948. They remained in these homes for more than one year before adoption proceedings were instituted in the counties where the prospective adoptive parents resided and during this period the children and the homes they were in were regularly visited and investigated by the association's social workers. Within a month or two after the required year's residence of the children with their prospective adoptive parents, the latter started adoption proceedings under the provisions of chapter 600, Code, 1950. In each instance the proceedings resulted in a decree of adoption, changing the children's names, and granting rights and imposing duties between adoptive parents and the children, the same as exist between natural parents and children, including rights of inheritance. Beverly and Charles, who are now about eight and

five years old, respectively, were adopted into one home. Marilyn and Robert, who are now about ten and nine years old, respectively, were adopted into one home. Esther, who is now about six years old, was adopted into one home.

The proof now before us is to the effect that since the adoption of the children the association, through its officers, has made an investigation relative to the welfare of the children in their respective adoptive homes. The officer's affidavit states:

"None of the children remember their natural parents * * *. The children are happy and well-placed. The parents are happy with the children and are rearing them as their natural children and the general welfare of each child is beyond question in the adoptive homes. None of the adoptive parents·desire to relinquish the children. The adoptive parents love the children as their own."

Now that we are confronted with this record of adoptions we must determine whether the adoptions were affected in any way by the appeal taken by the parents from the order of September 1948. There is no question but that order was a valid and binding order until the reversal in this court. The effect of the order was to deprive the natural parents of custody and grant permanent custody to the American Home Finding Association. Section 232.22, Code, 1950 specifically provides that when the trial court makes such an order of custody the institution becomes the proper party in place of the parents, for adoption proceedings. Section 232.23, Code, 1950 provides that the trial court could have placed restrictions deemed "advisable for the welfare of the child" in its order committing the children to the institution and "the jurisdiction of the court over said proceedings and said child shall continue until the child is legally adopted."

Though the appeal in a case involving child custody is triable de novo in this court it has never been held that the perfection of an appeal from a custody order operates to vacate the judgment of the lower court. Scheffers v. Scheffers, 241 Iowa 1217, 44 N.W.2d 676. This court, under the rule announced in the Scheffers case, could, upon proper application, have made

appropriate orders for the welfare of the children, and to preserve the status quo pending the appeal. Perhaps the trial court under the continuing grant of jurisdiction (section 232.23, Code, 1950) "until the child is legally adopted" could have made appropriate orders even after the notice of appeal that would have prevented adoption. The order appealed from was a self-executing order which required no process to carry out its mandate. The association had had custody of these children for two years and eight months prior to the order of September 1948. When the latter order was made, the association under the clear provisions of the statutes was authorized and empowered to place the children out for adoption, unless restricted by this court or possibly a subsequent order of the trial court. The record shows no application to stay the adoptive authority implicit in the trial court's order was ever made in this court or in the trial court. We must hold that the association's exercise of this authority resulted in legal adoptions long before the parties got around to filing the record on appeal in this court.

Perhaps at the start it was thought an order to prevent adoption would not be necessary since an adoption cannot, ordinarily, be accomplished in less than a year and it should not take a year to perfect and submit an appeal in such a case as this. But as time went on and appellants sought, and obtained from the trial court, ten extensions of time of thirty, sixty or ninety days each for filing the record it should have been perfectly apparent that some action should be taken by appellants to restrict the full sweep of the order if the status quo was to be preserved. The record here shows all of the adoptions were completed in October and November of 1949 while the printed record on the appeal was not filed in this court until October of 1950. We place no blame for the delay for we do not know all of the facts. We know there were arguments between counsel as to settling the record, but it does seem the case was one that called for co-operation by all parties to the end that there be a speedy and final adjudication of custodial rights. The custody of children of such tender years should be settled as quickly as possible for little children, like tender plants, have roots; they are roots of affection that are nurtured in the sunshine of a good home.

The longer they grow in mutual love and affection with those who fill the place of parents, the greater the shock of transplanting. The legislature has wisely encouraged early adoptions when permanent orders of custody in favor of institutions are made. All will agree that an institution does not furnish the most desirable atmosphere in which to rear young children. They need a home, and the legislature has said an unrestricted order of custody to an institution is a delegation of authority to that institution to consent to the adoption, to the end that the children receive a home. The adoption statutes provide such delegated consent will result in legal adoptions. We cannot under this record and under the plain provisions of the statutes hold otherwise.

It is our conclusion that the adoptions of these children were legal adoptions under the provisions of the statute. Regardless of what we did in our former opinion reversing the order of September 1948, that order was valid and binding until the reversal. More than a year before that reversal these children had been adopted after strict compliance with the adoption statutes. Those who voluntarily and generously take children for adoption have a right to assurance that the relationship they so kindly assume will be permanent. Our conclusion therefore is that as to these children who were adopted pending the appeal the adoptions are valid. This means that the trial court's order of custody of September 1948 as to the children named herein will remain unchanged. This amounts to an affirmance in part and changes our ruling on the entire appeal to an affirmance in part and a reversal in part.—Affirmed in part and reversed in part.

All JUSTICES concur.